RAYBURN R. CUNNINGHAM, APPELLANT, V.
THE NORTHWESTERN MUTUAL LIFE INSURANCE COMPANY,
APPELLEE.

27 N. W. 2d 221

Filed April 18, 1947. No. 32204.

*Charles A. Fisher,* for appellant.

*Edwin D. Crites, Gerald M. Swanstrom,* and *Stanley V. Jacobsen,* for appellee.

Heard before SIMMONS, C. J., PAINE, MESSMORE, YEAGER, CHAPPELL, and WENKE, JJ.

SIMMONS, C. J.

This is an action seeking a decree that a policy of life insurance had not lapsed. It involves the question of whether or not a premium payment was made in time to prevent default. The trial court found for defendant and denied the decree. Plaintiff appeals. We reverse and remand.

Plaintiff brought this action to secure a decree that a policy of life insurance issued by defendant to plaintiff was in full force and effect. Defendant sought a decree declaring the policy as not in force and effect. Plaintiff pleaded the policy, and further that by its provisions premiums were payable quarterly on the 6th day of March, June, September, and December of each year, with a 31-day grace period on all premiums after the first premium; that the right to have dividends applied on premiums was contained in the policy, and he had exercised that right; that during the life of the

policy he had made remittance by mail of the net due on the premium to defendant's agent in Lincoln, Nebraska; and that said remittances had always been accepted. Plaintiff further alleged that the net premium due on June 6, 1944, was $11.64; that on July 6, he had drawn his check on a Chadron bank payable to defendant's agent for that amount and had mailed it to defendant's agent in time to reach him on July 7. He also alleged that he had made tender of all subsequent premiums and that they had been declined.

Defendant pleaded the following provisions of the policy:

"No agent of the Company has any authority to waive forfeitures or to make, alter or discharge contracts."

"The insurance under this Policy is based upon annual premiums payable in advance, but payments may be made semi-annually or quarterly, in advance, at the premium rates therefor now in use by the Company, and change from the mode selected to either of the other of such modes may be made on any anniversary of the Policy. No premium after the first shall be considered paid (except it be duly charged as a premium loan) unless a receipt signed by the President or Secretary of the Company and countersigned by an agent authorized to receive such premium, shall be given therefor. Should default be made in the payment of any premium this Policy shall cease and determine except as hereinafter otherwise provided."

"A grace of thirty-one days, during which time the insurance shall remain in force, will be allowed for the payment of every premium except the first."

Defendant denied the payment within time of the premium due on June 6, 1944; alleged that it had not waived the terms of its policy with respect to payment of premiums; and admitted that by reason of the default it had declared the policy lapsed.

Plaintiff by reply alleged that by past practice defendant had waived the provisions of the policy and its

right to claim a forfeiture, and that by accepting and cashing the check above referred to defendant had waived any right to declare a forfeiture.

The trial court found generally for the defendant upon all issues joined.

This cause is here for trial de novo under assignments of error that fairly require an examination of the entire record.

When analyzed there is no material conflict in the evidence, except as to one matter which will be pointed out.

The defendant company maintains an agency in Lincoln for the collection of premiums. The cashier receives all letters and opens all the mail. When checks, accompanied by a premium notice, are received by the agency through the mail, the notice is checked by her to see if the remittance is received within the proper time. If unaccompanied by a premium notice or letter, the remittance is laid aside for the bookkeeper to check as against the record to ascertain if it is received within time. If it is found that it is past the grace period, the remittance is deposited and carried in a suspension account until advice is obtained as to how to handle it. If a question arises and if the date of mailing, as shown on the envelope, indicates that the remittance was mailed within the grace period, it is not considered as a default as the time of mailing governs. It also is the practice of the office to deposit all checks received in the morning on that day, and checks received in the afternoon mail are deposited on the following day.

Plaintiff, during the life of this policy, had received premium notices by mail. During the life of the policy he had made remittance by check by mail. Usually, the remittance was made toward the close of the grace period. Plaintiff paid the premiums quarterly, remitting the net due after deducting the dividend credit. The record shows that remittances on several occasions were received at Lincoln and receipts issued after the grace

period had expired. This defendant explains by the statement that they evidently were mailed during the grace period. The defendant made no objection to payments so received.

The premium here involved was due June 6, 1944. The grace period expired July 7, 1944. The premium due was $18, the dividend was $6.36, and the cash payable $11.64. The plaintiff made out his check, dated July 6, 1944, payable to defendant's agent, and testified that he mailed it that day from Whitney, Nebraska, in a self-addressed envelope furnished by the defendant. He testified that he did not particularly remember going to the post office with it, and based his statement in part upon his custom and habit of so mailing it toward the close of the grace period. He fixes the time of mailing by the date of the check. Apparently the premium notice was not enclosed with the check. In the regular course of the mail, a letter so mailed should have arrived in Lincoln at 7 a. m. on July 7, 1944.

The next thing the record shows about the check is that it was entered on the various records of the defendant and deposited in a bank on July 17, 1944. From that fact and the custom of handling this business, the defendant's witnesses testify that the check was received on July 17, 1944. Clearly the witnesses had no independent recollection or knowledge of when the check was received. However, at the time here involved, the defendant's bookkeeper was away on vacation and a new clerk was assisting in the office. Defendant's witnesses testify that the new clerk handled the check and made the deposit. This new clerk was not produced as a witness. The envelope in which the remittance was made is not in evidence. Defendant's witness thinks it was put in the wastebasket. The check was entered on a report "listed for special handling" as "Credit Suspension Account for automatic premium loan." The check cleared and was paid by the bank on which it was drawn in due course.

The plaintiff received his bank statement about July 22nd or 23rd and looking through it did not find the check. He was concerned. He called defendant's office by long distance and talked with the cashier, and asked if the check had been received. Here occurs the conflict in the evidence. Plaintiff testifies that the cashier told him the check had been received; that it was all right; and that she would write him about it "tomorrow." The cashier fixes the date of this call as "about two weeks after the grace period had expired * * * around August 5th." She testified that the substance of plaintiff's statement was that he knew the check "was late." She further testified that the substance of her answer was that if the policy contained an automatic premium loan provision and there was sufficient value in the policy, the premium would be automatically taken care of, and if not, it could be reinstated through the use of a health form. She also testified that she told him she would look it up and write him in detail; that she wrote plaintiff; and that the letter is an exhibit in the case. The earliest dated letter in the exhibits from the cashier to the plaintiff is dated September 5, 1944, and is in its entirety as follows: "We have been wondering why we have not heard from you with regard to the restoration of your policy No. 1 142 175. The Company has now forwarded to us the enclosed check for $6.36 representing the balance of dividend due on your policy at the time it lapsed. If you are going to reinstate this policy soon, this check may be returned without being endorsed. If you are not going to reinstate the policy, the check may be presented for payment any time." Under date of August 21, 1944, from its Milwaukee office, the defendant wrote the plaintiff that "In consequence of non-payment of premium due" the indebtedness against the policy had been satisfied; that there remained in force temporary insurance expiring November 19, 1944; and that if plaintiff wished to apply for reinstatement, to notify the defendant. Plaintiff, after receiving this letter, again

called the defendant's cashier, asked what had been done with the check, and was told that the check had been deposited, and that she would send him a reinstatement blank. He then again examined his bank statement and found the check. He explained that it was not his habit to reconcile his bank statement. The cashier testified as to this conversation and testified that she told him he could apply for a restoration of the policy.

On September 22, 1944, the cashier wrote the plaintiff as follows:

"We told you over the telephone that it would be necessary for you to complete a Health Form for this policy, and you agreed to do so, as soon as this form was received. As yet, we have not received the Health Form, and we cannot reinstate the policy until it is received.

"If you will have this Health Form completed by the Doctor there and returned to us promptly, the matter will be given attention. If you forward the Health Form, you should send in the gross premium, because the dividend check was mailed to you some time ago. Your prompt attention to this matter will be greatly appreciated."

The defendant admits that it received the $11.64 check, and that it deposited it to its account, but testified that it held it to plaintiff's credit. On September 5, 1944, the defendant sent the plaintiff a check for $6.36, representing the "balance of dividend due on your policy at the time it lapsed." On September 22, the defendant's agent sent plaintiff his check for $11.64. Plaintiff returned these two checks to the Lincoln office by letter dated September 25, 1944. These were returned to plaintiff on September 26, 1944, in a letter refusing to accept them on the ground that the policy was in a lapsed condition.

On September 29, the defendant from its Milwaukee office wrote plaintiff ratifying this action and advising that the general agent at Lincoln would cooperate with

him in reinstatement. Plaintiff was furnished various forms for reinstatement which he did not execute.

Plaintiff made tender of subsequent premiums which were returned.

That the check was mailed to defendant's agent, received by him, deposited, paid, and the proceeds retained by him for some time is not disputed. Under defendant's testimony it is the time of mailing and not the time of receipt by defendant that governs. The evidence as to handling of prior remittances made by plaintiff sustains this rule. The first precise question then to be determined is, did plaintiff mail the premium check to defendant before the grace period expired?

The plaintiff testifies positively that he mailed the check within the grace period. Defendant's witnesses testified that the check was not received until July 17; however, that is not the date received but the date the check was entered on defendant's records and deposited to its agent's account. Prior to the making of those entries, this check was handled by the agency cashier and an inexperienced clerk acting as bookkeeper. How long that handling took by the acting bookkeeper is not revealed by this evidence, save as the evidence is that the practice was to deposit all checks by at least the day after receipt. The testimony of the clerk was not offered. Defendant's witnesses had no independent recollection of when the remittance was received. The envelope that would have fixed the date of mailing was not kept. We do not intend an inference that the disposition of the envelope was to destroy unfavorable evidence. Yet we think the fact that the envelope was not retained is important. Defendant's witness testified as to the routine of handling remittances by mail. All mail was opened by the agency cashier. She testified that she received and opened this letter, but we assume that the answer was based on practice rather than on independent recollection. She testified that remittances were checked against notices by her to see if received on

time. If there was no notice enclosed, as was the case here, the remittance was "laid aside" for the bookkeeper to check to see if received on time. The defendant's agent adds one other practice. In explaining why receipts in some instances were issued after the expiration of the grace period, he stated: " * * * the date on the envelope would indicate when that check was mailed, and if it was mailed on the last day of the grace period, it would be acceptable." If an examination of the envelope in question was made when this remittance was questioned, it would have revealed whether or not mailed within time. The fact that there is no evidence here by the defendant as to the mailing date on the envelope is a circumstance to be considered in determining the fact question.

Defendant further relies upon the disputed telephone conversation in which the cashier testified that plaintiff said he knew the remittance "was late" and argues that to be an admission that he was in default. The witness' recollection is not too accurate on other matters connected with that conversation. She says that it occurred "about two weeks after the grace period had expired on this premium, on, I would say, around August 5th." But August 5 would be four weeks after the expiration of the grace period. She states that they then discussed the reinstatement of the policy, and that she promised she would write him and did. But her earliest letter to plaintiff was dated September 5, after he had received the letter of August 21, 1944, from defendant's Milwaukee office, and after plaintiff had called a second time about the policy. Even accepting her testimony that plaintiff said he knew the remittance "was late" does not require that we hold he said he knew he was in default. Late is defined as "Far advanced toward the end or close, as of the day, night, life, or other period; as, a *late* hour of the day." Webster's New International Dictionary (2d ed.), Unabridged. So here, the remittance was late in the grace period, but not necessarily beyond

it. Such a construction is in entire accord with plaintiff's position throughout this controversy.

The fact that plaintiff pleaded a waiver in his reply does not constitute an admission that he was in default, for here defendant states that "one of the vital issues tried was the question as to whether plaintiff mailed his premium check before the grace period expired." That having been an accepted issue in the trial court, it will not be departed from here.

We are of the opinion that this evidence requires a finding that the remittance was mailed in time, and that a default did not occur. The question of waiver in the event the premium was paid late need not be determined.

Stipulations in a contract of life insurance inserted for the benefit of the insurer may be waived by it. Hartford Life & Annuity Ins. Co. v. Eastman, 54 Neb. 90, 74 N. W. 394. So far as the stipulations pleaded are involved here, the evidence shows that they not only were waived as to this policy holder and policy, but were waived generally by the defendant at its Lincoln agency.

Plaintiff requests the allowance of an attorney's fee under the provisions of section 44-359, R. S. 1943, which provides: "In all cases where the beneficiary, or other person entitled thereto, brings an action at law upon any policy of life, * * * insurance * * * against any company, * * * the court, upon rendering judgment against such company, * * * shall allow the plaintiff a reasonable sum as an attorney's fee in addition to the amount of his recovery, to be taxed as part of the costs. If such cause is appealed, the appellate court shall likewise allow a reasonable sum as an attorney's fee for the appellate proceedings."

" 'It is the practice in this state to allow the recovery of attorneys' fees only in such cases as are provided for by law, or where the uniform course of procedure has been to allow such recovery. As a general rule of practice in this state, attorneys' fees are allowed to the successful party in litigation only where such allowance

is provided by statute.' " Shepard v. Shepard, 145 Neb. 12, 15 N. W. 2d 195.

Obviously, under the statute plaintiff is not entitled to an attorney's fee. It accordingly is denied.

The decree of the district court is reversed and the cause remanded with directions to enter a decree for plaintiff in accord with this opinion.

REVERSED AND REMANDED.

CARTER, J., participating on briefs.

CARTER, J., dissenting.

In my opinion the evidence was not sufficient to sustain a finding that the premium was paid in accordance with the provisions of the policy and the law applicable thereto. In addition thereto the opinion of the majority ignores the fact that the trial judge saw the witnesses, had an opportunity to judge their credibility, and determined the fact issue in favor of the defendant.